UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| VENTURE COMMUNICATIONS COOPERATIVE, INC., <br><br> Plaintiff, <br><br> vs. <br><br> JAMES VALLEY COOPERATIVE TELEPHONE COMPANY, NORTHERN VALLEY COMMUNICATIONS, LLC, <br><br> Defendants. | 3:20-CV-03011-RAL <br><br><br> OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

The parties in this action are broadband[1] internet providers and competitors in South Dakota. Plaintiff Venture Communications Cooperative, Inc. (Venture) sued Defendants Northern Valley Communications, LLC (Northern Valley) and James Valley Cooperative Telephone Company (James Valley) for violating 47 U.S.C. § 220(e), intentional interference with business expectancy, and civil conspiracy. In short, Venture alleges that Northern Valley intentionally and falsely reported its broadband capabilities to the Federal Communications Commission (FCC) on Form 477s, and Northern Valley's false reporting deprived Venture of millions of dollars in federal subsidies. But the material facts not subject to genuine dispute show no such intentionally false

---

[1] Broadband is high-speed internet that is not available through dial up. Doc. 109-5 at 2. Broadband internet can be provided by fiber optic cables, wireless, satellite, digital subscriber line, or a cable modem. Doc. 109-5 at 3.

1

reporting by Northern Valley under the FCC guidance that governs Form 477 filings. This Court therefore grants Defendants' motion for summary judgment.

### I. Undisputed Material Facts and Procedural History

### A. The Connect America Fund (CAF), Alternative Connect America Cost Model (A-CAM I), and Alternative Connect America Cost Model II (A-CAM II)

Venture provides broadband internet and voice service to approximately 12,000 customers in rural South Dakota. Doc. 1 at 2; Doc. 20 at 1; Doc. 48 at 1. James Valley and Northern Valley (collectively Defendants) also provide broadband internet and voice service in South Dakota. Doc. 1 at 2. Northern Valley is a wholly-owned subsidiary of James Valley, and James Groft is the CEO of both companies. Doc. 1 at 5; Doc. 7; Doc. 20 at 3; Doc. 110-5 at 2; Doc. 110-7 at 9.

Providing broadband internet in rural areas is often not cost efficient. See Doc. 1 at 2, 7. In recognition of this, the FCC created the Connect America Fund (CAF) in 2011 to expand internet access by funding companies to offer broadband internet in rural areas. Doc. 1 at 7; Doc. 48 at 7; Doc. 105-10 at 3. In 2014, the FCC created the Alternative Connect America Cost Model (A-CAM I) to distribute CAF funding to eligible broadband providers. Doc. 1 at 7; Doc. 48 at 7; Doc. 108-1 at 2. A-CAM I awarded CAF grants totaling approximately $1.5 billion over ten years. Doc. 122 at 8; Doc. 135 at 3.

Under A-CAM I, the FCC relied on information in broadband carriers' Form 477 filings to determine how to distribute CAF funding. Doc. 1 at 6; Doc. 20 at 3; Doc. 48 at 8. Broadband providers report the broadband speeds they offer by census block in Form 477s and submit Form 477s to the FCC twice a year. Doc. 1 at 5–6; Doc. 20 at 3; Doc. 48 at 5–6. Since 2013, the FCC has required broadband providers such as Northern Valley to report their maximum "advertised" bandwidth speed per census block in Form 477s. Doc. 120-7 at 3; Doc. 121 at 22; Doc. 122 at 2; Doc. 135 at 1.

The FCC does not require broadband providers to test and report the broadband speeds they *actually* provide by census block, and the FCC has acknowledged such a requirement would impose an undue burden on providers. Doc. 120-7 at 3; Doc. 122 at 2–3; Doc. 135 at 2. In 2013, the FCC explained:

> The Commission currently collects data on advertised speeds. The Commission sought comment on whether it should continue to collect data only on advertised speeds, or whether, for example, providers should provide information about actual speeds by geographic area, or speeds that extend beyond the access network . . . . *We conclude that it is not appropriate or feasible to collect actual speed information from broadband providers via Form 477.* Many commenters expressed concern because there is no way for providers to report actual speed information in a meaningful way. Commenters explain that the collection of these data is a highly complex, time consuming, and expensive undertaking that requires the use of specialized equipment in the providers' networks and at their customers' premises. As the Commission found in 2008, "*the record of this proceeding does not identify a methodology or practice that could be applied, consistently and by all types of broadband filers, to measure the information transfer rates actually observed by end users.*" We continue to believe that conclusion is correct.

Doc. 122 at 2 (emphasis added); Doc. 135 at 2. If a broadband provider does not advertise broadband speeds, the FCC instructs the provider to "report the best speed that an end user can reasonably expect to receive over that particular technology" per census block. Doc. 122 at 5; Doc. 135 at 2. If at least one customer in a census block is expected to receive a particular speed, the FCC instructs providers to report that speed for the entire census block. Doc. 111-1 at 5, 7. Broadband providers also report voice subscriptions by census block in Form 477s.[2] Doc. 108-1 at 2, 25 n.12.

---

[2] In the complaint, Venture alleges that the FCC requires broadband providers to report voice service *available* by census block in Form 477s. Doc. 1 at 6. Defendants argue that the FCC only requires broadband providers to report if voice service is available in a state. Doc. 122 at 13–14. In Venture's response to Defendants' Statements of Undisputed Material Fact, it does not dispute Defendants' claim that providers are not required to report the availability of voice service at the census track level, but Venture argues voice service is not an issue in this case. Doc. 135 at 5. The record shows that the FCC through Form 477 requires an unsubsidized competitor to report

3

It is a crime to willfully misrepresent broadband speeds in 477 Forms under 47 U.S.C § 220(e).  47 U.S.C § 220(e).  Additionally, 47 U.S.C. § 207 gives broadband providers a private right of action to sue competitors who intentionally misreport data on their Form 477s.  47 U.S.C. § 207; see also Venture Commc'ns Coop., Inc. v. James Valley Coop. Tel. Co., 492 F. Supp. 3d 946, 955–57 (D.S.D. 2020).  A Form 477 must be signed by a broadband provider's "certifying official," who attests that the form was filled out correctly to the best of his or her knowledge. Doc. 48 at 7.

Using data collected from Form 477s, the FCC awarded grants under A-CAM I to broadband providers serving census blocks in which an "unsubsidized competitor" was NOT already providing voice service and broadband speeds at a minimum of 10 megabits per second (Mbps) download and 1 Mbps upload (10/1 Mbps).  Doc. 1 at 7–8; Doc. 20 at 3; Doc. 48 at 8; Doc. 122 at 8; Doc. 135 at 3.  To target rural areas with the highest need, A-CAM I also did not award CAF funding for census blocks in which a broadband provider had already deployed fiber optic cable.  Doc. 121 at 31; Doc. 122 at 8; Doc. 135 at 3.  After the FCC announced CAF grants under A-CAM I, a provider could challenge a grant decision through a formal review process.  Doc. 48 at 8.  The FCC issued an order that resolved challenges to A-CAM I decisions in 2016, granting some requests to adjust CAF grants and denying others.  Doc. 108-1; Doc. 122 at 9; Doc. 135 at 3.

In March 2018, the FCC implemented A-CAM II to support broadband providers that had been excluded under A-CAM I.  Doc. 1 at 8; Doc. 20 at 3; Doc. 122 at 11; Doc. 135 at 4.  Under A-CAM II, the FCC continued to award CAF funds annually for up to 10 years but made several

---

voice *subscription* data by census block, rather than the availability of voice service by census block.  Doc. 105-2 at 19–20; Doc. 108-1 at 2, 25 n.12.

modifications to broaden eligibility. Doc. 1 at 8; Doc. 20 at 3; Doc. 48 at 8. First, A-CAM II no longer excluded broadband providers that had already deployed fiber optic cable in their service areas. Doc. 107-1 at 6; Doc. 122 at 11; Doc. 135 at 4. Next, A-CAM II excluded census blocks from funding only if an unsubsidized competitor provided broadband speeds of at least 25/3 Mbps in those census blocks. Doc. 105-10 at 8; Doc. 122 at 13; Doc. 135 at 5. Like with A-CAM I, A-CAM II relied on data from Form 477s to determine CAF grants. Doc. 1 at 8; Doc. 48 at 8. But A-CAM II eliminated the challenge process that was available under A-CAM I. Doc. 1 at 8; Doc. 20 at 5; Doc. 48 at 8; Doc. 122 at 12; Doc. 135 at 4. The FCC explained that the challenge process proved to be unhelpful in practice because it was difficult to prove when an unsubsidized competitor was not providing broadband speeds as reported in Form 477 filings. Doc. 122 at 13; Doc. 135 at 5.

Importantly, in 2016, the FCC issued an order stating that whether a broadband provider provides voice service under A-CAM I is "determined at the holding company level in a state."[3] Doc. 108-1 at 2, 25 n.12. The parties agree that this language means a broadband provider who offers voice service somewhere in a state is considered to offer voice service throughout a state and may be considered an "unsubsidized competitor" under A-CAM I and A-CAM II. Doc. 122 at 13–14; Doc. 124-13 at 3; Doc. 135 at 5. Chad Duvall, an expert witness for Defendants, explained in his report that although the "FCC Form 477 reports voice subscription totals at the statewide level as well as voice subscription counts at the census tract level," the FCC made a "policy decision to count voice subscription anywhere in the state as the availability of voice service everywhere in that state." Doc. 111-5 at 11, 20. In other words, "[t]he FCC determined

---

[3] The language in full states: "[w]hether an unsubsidized competitor provides voice is based on Form 477 voice subscription data which are reported at the census track level, *and is determined at the holding company level in a state*." Doc. 108-1 at 2, 25 n.12 (emphasis added).

that for purposes of both A-CAM I and A-CAM II that the provision of voice services by a carrier anywhere within a state would be interpreted to mean that the carrier provided voice services in all census blocks within the state." Doc. 111-5 at 21.

Venture was not eligible for any funding under A-CAM I in census blocks where it had deployed fiber optic cable. Doc. 122 at 9; Doc. 135 at 3. However, because A-CAM II no longer excluded census blocks from funding in which providers had already deployed fiber optic cables, Venture became eligible for CAF funding under A-CAM II in certain census blocks. In fact, Venture was awarded and accepted a CAF grant under A-CAM II of $103,795,460 over ten years. Doc. 122 at 49; Doc. 123-6 at 10; Doc. 135 at 21.

Venture, however, alleged in its complaint that it would have received a total grant of $123,989,660 if the FCC had not improperly excluded census blocks in which both Venture and Northern Valley offered broadband internet, which this Court will call the "Overlap Area," in its calculations. Doc. 1 at 14; Doc. 48 at 20; Doc. 123-6 at 10. Northern Valley is an unsubsidized competitor and reported providing broadband speeds of 25/3 Mbps in the Overlap Area in 2017, resulting in the exclusion of these census blocks in calculating Venture's A-CAM II grant. Doc. 1 at 12. Venture has since revised its calculations of the amount of funding it believes it is entitled to under A-CAM II and now claims that Defendants' false reporting denied it $12,683,700 in federal subsidies.[4] Doc. 134 at 5.

---

[4] Venture initially requested compensatory damages in excess of $20,000,000 in its complaint and amended complaint. Doc. 1 at 14; Doc. 48 at 20. However, Venture appears to adopt the conclusions of Dominic Villecco, its expert witness, who estimated that the conduct alleged cost Venture $12,683,700 in federal subsidies. Doc. 127-1; Doc. 127-2; Doc. 134 at 5.

**B. Northern Valley's Form 477 Filings**

In 2015, Northern Valley misrepresented its broadband capabilities on its Form 477 filing. Doc. 1 at 10; Doc. 20 at 4; Doc. 48 at 10. The Interstate Telecommunications Cooperative, Inc. (ITC), another broadband provider and competitor to Northern Valley, filed an A-CAM I Competitive Challenge with the FCC claiming Northern Valley's 2015 Form 477 was inaccurate. Doc. 1 at 10; Doc. 20 at 4; Doc. 48 at 10. According to Defendants' expert Chad Duval, Northern Valley had erroneously reported offering broadband internet in 1,211 census blocks in its 2015 Form 477, and some of these census blocks were also served by ITC and Venture. Doc. 111-5 at 9. Northern Valley admitted that its 2015 Form 477 was inaccurate and submitted a corrected form but denied intentionally misrepresenting its broadband capabilities. Doc. 49 at 5–6. The FCC accepted Northern Valley's corrections and adjusted ITC's A-CAM I award to reflect the changes. Doc. 20 at 4; Doc. 124-19 at 25. Left uncorrected, Northern Valley's 2015 Form 477 would have caused ITC to receive a significantly smaller CAF grant than what it was entitled to receive. Doc. 20 at 4.

Around this time, Defendants sued South Dakota Network, LLC (SDN) and Randy Houdek for tortious interference with prospective business opportunities. Doc. 1 at 11; Doc. 20 at 4–5; Doc. 48 at 12; Doc. 122 at 15; Doc. 135 at 5. Houdek was on SDN's board of managers at the time and is Venture's CEO. Doc. 1 at 11; Doc. 20 at 4–5; Doc. 48 at 12; Doc. 122 at 15; Doc. 135 at 5. According to Venture, Defendants sued to retaliate against SDN after SDN attempted to prevent Defendants from engaging in "access stimulation" or "traffic pumping." Doc. 48 at 11. "Traffic pumping" or "access stimulation" occurs when a broadband provider takes allegedly artificial steps to generate high traffic of rural network calls to impose higher charges on long distance carriers. Doc. 48 at 11–12. The FCC has scrutinized this practice. Doc. 48 at 11–12.

Defendants deny having a retaliatory motive and claim they sued SDN and Houdek because SDN and other broadband providers engaged in a conspiracy to hurt Defendants' relationship with a long-distance carrier.[5]  Doc. 49 at 6.  Whatever Defendants' motive may have been, the parties ultimately entered a settlement agreement.  Doc. 122 at 17; Doc. 135 at 6.

Several years later, in July 2017, Northern Valley acquired another wireless internet service provider, Northern Wireless (NW).  Doc. 122 at 20, 26; Doc. 124-15 at 15; Doc. 135 at 7.  During the due diligence process, Northern Valley learned of NW's broadband equipment and the broadband speeds it offered.  Doc. 110-7 at 3; Doc. 112-2 at 5; Doc. 122 at 26; Doc. 135 at 10.

NW used three different broadband systems in its service area, two of which offered speeds greater than 25/3 Mbps.  Doc. 110-7 at 3–4, 11.  The oldest system, DOCSIS, offered broadband speeds of 10–12 Mbps download.  Doc. 110-7 at 3; Doc. 122 at 22; Doc. 135 at 8.  Defendants claim that WiMAX, a newer system installed in 2012, could provide speeds of up to 30 Mbps download.  Doc. 110-7 at 3; Doc. 122 at 22.  Venture disputes this based on Groft's statement in his deposition that WiMAX sometimes provided slower speeds to customers.  Doc. 135 at 8; Doc. 135-2 at 4.  Finally, the Cambrium system, installed in 2015 and 2016, provided the highest speeds, sometimes up to 116.3/19.7 Mbps near service towers.  Doc. 110-7 at 3–4, 6; Doc. 122 at 24; Doc. 135 at 9.  After NW installed Cambrium in 2016, it began offering internet packages for up to 70/8 Mbps.  Doc. 110-7 at 6.  NW employees regularly conducted field tests to confirm the accuracy of

---

[5] In the complaint in the present case, Venture alleges that James Groft, CEO of the Defendants, "attacked" Venture's CEO Randy Houdek aggressively at some point during the previous lawsuit. Doc. 1 at 12; Doc. 20 at 5; Doc. 48 at 12; Doc. 122 at 16.  However, when asked to clarify this statement in his deposition, Houdek explained that the "attack" merely referred to Defendants' choice to bring the lawsuit against him personally.  Doc. 122 at 16.  Venture disputes Houdek's characterization of the "attack" but does not offer any other explanation.  Doc. 106-2 at 13; Doc. 135 at 6.

the broadband speeds they offered before the acquisition. Doc. 110-7 at 8; Doc. 122 at 26; Doc. 135 at 8.

Critically, NW offered broadband internet in the Overlap Area, but it did not provide voice service there. Doc. 110-7 at 1, 4, 10; Doc. 121 at 18–19; Doc. 122 at 44; Doc. 135 at 19. On NW's June 2017 Form 477 filing, it reported providing speeds of 70/8 Mbps in 7,712 census blocks and 25/3 Mbps in 3,666 census blocks. Doc. 111-5 at 10; Doc. 122 at 28; Doc. 135 at 12. NW also accurately reported that it did not provide voice service in any census block. Doc. 122 at 28; Doc. 135 at 12. NW advertised the following four broadband packages: 1) up to 5 Mbps download; 2) up to 15 Mbps download; 3) up to 45 Mbps download; and 4) up to 70 Mbps download. Doc. 110-7 at 7. Northern Valley obtained NW's equipment and customers through the acquisition in July 2017, and it assumed responsibility for providing service to former NW customers after the purchase was finalized. Doc. 110-6; Doc. 110-7 at 10; Doc. 122 at 26–27; Doc. 135 at 11.

Since 2013 or 2014, Northern Valley has reported broadband speeds of 25/3 Mbps on its Form 477s for all census blocks it served. Doc. 111-1 at 6; Doc. 122 at 29; Doc. 134-8 at 6; Doc. 134-10 at 3; Doc. 135 at 12. On Northern Valley's December 2017 Form 477 at issue in this case, Tanya Berndt was the data contact person, and James Groft was the certifying official. Doc. 111-2. Berndt worked at Northern Valley's billing department and prepared its Form 477s twice a year. Doc. 111-1 at 5–6; Doc. 122 at 29–31; Doc. 135 at 12.

In July 2017, Berndt reached out to NW to obtain its Form 477 data. Doc. 111-1 at 6; Doc. 122 at 29; Doc. 135 at 12. Upon receipt of the data, she noted that NW had reported broadband speeds as high as 70/8 Mbps in some census blocks and that NW customer billing records showed some NW customers paying for such speeds. Doc. 111-1 at 6; Doc. 122 at 31; Doc. 135 at 12. However, Berndt testified that she did not believe Northern Valley advertised speeds of 70/8 Mbps.

9

Doc. 111-1 at 6. In 2017, Northern Valley advertised speeds of up to 25 Mbps, 50 Mbps, and 100 Mbps download on its website, with a disclaimer that "Speeds not guaranteed, not available in all areas." Doc. 111-3; Doc. 111-4; Doc. 111-5 at 14; Doc. 122 at 30; Doc. 135 at 12. Berndt reported the newly acquired census block as providing broadband speeds of 25/3 Mbps, consistent with Northern Valley's practice, in Northern Valley's 2017 Form 477. Doc. 48 at 13; Doc. 49 at 6–7; Doc. 111-1 at 6; Doc. 134-8 at 6; Doc. 122 at 31; Doc. 135 at 12.

As stated above, in 2013 the FCC reaffirmed that broadband providers are to report advertised speeds on Form 477s and that "it is not appropriate or feasible to collect actual speed information from broadband providers via Form 477." Doc. 122-2; Doc. 135 at 1. Nonetheless, Venture's claim that Northern Valley misrepresented its broadband speeds rests principally on the testimony of its expert, Dominic Villecco, who conducted actual speed testing through radio frequency analysis for the Overlap Area. Doc. 127-1; Doc. 127-2. Venture states, "Mr. Villecco ultimately concluded that defendants could not provide 25/3 Mbps service in 341 of the 525 census blocks in the [O]verlap [A]rea." Doc. 127 at 11. Viewing the facts in the light most favorable to non-movant Venture, Northern Valley has provided at least 25/3 Mbps service in 184 of the 525 census blocks—and has failed to provide 25/3 Mbps service in 341 of the 525 census blocks—in the Overlap Area based on testing by Venture's expert.

### C. Venture's attempt to change its CAF grant under A-CAM II

In early 2019, before the FCC promulgated A-CAM II decisions on grants to broadband providers, Venture became concerned that the Overlap Area would be excluded in calculating its CAF grant. Doc. 15-16 at 3; Doc. 122 at 34; Doc. 135 at 14. John Kuykendall is a lawyer and Vice President of Regulatory Affairs at John Stauralakis, Inc. and advised Venture and other broadband providers on FCC regulations. Doc. 123-5 at 6. On April 18, 2019, Kuykendall, on

behalf of Venture and ITC—the broadband provider which had challenged Northern Valley's 2015 Form 477—submitted a letter to the FCC stating that Venture believed Northern Valley had inaccurately reported its broadband speeds in its 2017 Form 477 as it had in 2015. Doc. 15-16 at 3. Kuykendall also asked the FCC to reinstitute the challenge process for CAF grants that was available in A-CAM I on behalf of ITC, Venture, and similarly situated broadband providers under A-CAM II. Doc. 15-16 at 3.

On April 30, 2019, Kuykendall emailed Groft concerning Northern Valley's December 2017 Form 477 on behalf of ITC and Venture. Doc. 112-6 at 4. Kuykendall stated that he believed Northern Valley's 2017 Form 477 may have been inaccurate like it was in 2015. Doc. 112-6 at 4–5; Doc. 124-10 at 4–5. And he asked Groft to submit a letter to the FCC stating that Northern Valley's 2017 Form 477 was inaccurate, as Northern Valley had done in 2015. Doc. 112-6 at 5.

On May 2, 2019, the FCC announced CAF grants under A-CAM II, publishing that Venture would receive $10,379,546 annually for the next ten years. Doc. 15-17; Doc. 16-1; Doc. 113-6 at 18; Doc. 122 at 43; Doc. 135 at 18. The FCC gave broadband providers until June 17, 2019, to decide whether to accept the grants. Doc. 16-1. As Kuykendall expected, the FCC did not award Venture any funding for the census blocks in the Overlap Area. See Doc. 48 at 13–15; Doc. 124-11 at 22.

On May 6, 2019, Kuykendall followed up with Groft by sending a draft letter, which he proposed Groft finalize and file with the FCC. Doc. 112-6 at 3–4. The draft letter stated that Northern Valley should not be considered an unsubsidized competitor for the Overlap Area because it could not provide the broadband speeds reported in its 2017 Form 477. Doc. 113-5. The draft letter then stated that Northern Valley had revised its Form 477 filing to correct the

inaccuracies and asked the FCC to adjust its A-CAM II decisions for ITC and Venture to reflect

the corrections. Doc. 113-5. Groft responded:

> [Northern Valley] did indeed have excess coverage reported on our legacy wireless
> network [in 2015], but that is not the case now.  In 2017 we purchased . . . [NW]
> that had some of its coverage in Venture and ITC territory as is indicated in our 477
> reporting.  We inherited this coverage from them and have had to keep it active to
> maintain broadband service to the customers that they originally served in those
> areas.  We have not built out our legacy service in these areas or enhanced that of .
> . . [NW] but the preexisting coverage is there nonetheless.

Doc. 112-6 at 3.

Groft also wrote that he did not believe Northern Valley was an "unsubsidized competitor"

that could "interfere[] with anyone's A[-]CAM 2 offer" because it did not provide "voice service

within the boundaries of Venture[ and] ITC." Doc. 112-6 at 3; Doc. 124-10 at 3.  Groft added,

"[w]e want to help and will consider sending a letter regarding voice service but cannot submit

one saying that we haven't deployed broadband service [in the NW coverage area] because that is

not accurate." Doc. 48 at 14; Doc. 112-6 at 3; Doc. 124-10 at 3.  Kuykendall revised the draft

letter accordingly and submitted it to Groft, which Groft reviewed and signed.  Doc. 112-6 at 2;

Doc. 124-10 at 6–7.  Kuykendall then submitted the signed letter to the FCC at the end of May

2019.  Doc. 15 at 8; Doc. 112-6 at 2.

The letter stated that Northern Valley's Form 477 was inaccurate in so far as it could not

provide voice service as an unsubsidized competitor in the census blocks also served by ITC and

Venture. Doc. 15-18; Doc. 113-7.  It then asked the FCC to reconsider its A-CAM II decisions

for Venture and ITC based on this information. Doc. 15-18; Doc. 113-7.  The letter did not discuss

the broadband speeds that Northern Valley had reported in its 2017 Form 477. Doc. 15-18; Doc.

113-7. In his deposition, Houdek stated that he did not believe the letter would change the FCC's

decision on Venture's CAF grant under A-CAM II but figured that submitting it was better than nothing. Doc. 106-2 at 41.

On June 5, 2019, the FCC issued a public notice of modifications to its A-CAM II decisions. Doc. 124-11 at 18–22. The FCC did not make any changes to ITC or Venture's CAF grant, and it did not award Venture any CAF funding for the Overlap Area. See Doc. 48 at 13–15; Doc. 124-11 at 22. Unlike in 2015, there is no evidence that the FCC took any action on Northern Valley's 2017 Form 477 after Kuykendall submitted the letter from Groft on Venture's behalf. Doc. 106-2 at 19. On June 12, 2019, Venture accepted its A-CAM II offering for $103,795,460 over ten years. Doc. 113-6 at 30; Doc. 122 at 49; Doc. 123-6 at 10; Doc. 135 at 21. However, ITC informed Houdek and Kuykendall over email that it would delay accepting its A-CAM II offer until "July 10th or so[,]" stating "[w]e were kind of hoping/praying/waiting for a miracle that some sort of revised offer would be made to ITC" and a "waiver of the deadline" to accept its A-CAM II award "would be appropriate" to allow such a delay. Doc. 114-1 at 4.

Kuykendall responded to ITC and Houdek by email, stating that although there was no challenge process under A-CAM II, there was an informal "waiver process" through which a party could challenge its A-CAM II award. Doc. 114-1 at 1; Doc. 124-11 at 2; Doc. 124-13 at 1–3; Doc. 124-16 at 14. By filing a waiver, a party could extend the deadline to accept its A-CAM II offer for thirty days while the party informally petitioned the FCC to change its decision. Doc. 124-11 at 2. Kuykendall described this waiver process as kind of an "unwritten rule" under which the FCC would revise an A-CAM II decision if extraordinary circumstances were brought to its attention. Doc. 124-16 at 14. Kuykendall also explained that the FCC had reconsidered an A-CAM II decision at least once after an unsubsidized competitor reported that its Form 477 was inaccurate. Doc. 124-11 at 1.

Nonetheless, Kuykendall cautioned ITC and Venture that he did not believe an informal appeal for CAF funding in the Overlap Area would be successful. Doc. 124-13 at 1–3. Kuykendall explained that Northern Valley did not provide voice service in the Overlap Area. Doc. 124-13 at 2. However, because Northern Valley provided voice service elsewhere in South Dakota, the FCC was unlikely to modify its grant decision for ITC and Venture under A-CAM II. Doc. 124-13 at 2–3. As discussed previously, the FCC considered a broadband provider to provide voice service under A-CAM I and A-CAM II so long as it provided voice services somewhere in the state, even if the provider did not offer voice service in the census blocks eligible for CAF funding. Doc. 124-13 at 2. Further, Groft had affirmed that the broadband speeds Northern Valley reported for the Overlap Area were accurate due to Northern Valley's acquisition of NW in 2017. Doc. 114-1 at 2. "Unless some other evidence can be produced," Kuykendall stated, "it would not be worth a petition . . . as the Bureau would most assuredly deny the request." Doc. 114-1 at 2.

In April 2020, Venture filed this complaint against James Valley and Northern Valley, alleging violation of 47 U.S.C. § 220(e), tortious interference with a business expectancy, fraud, and unfair competition. Doc. 1. Venture alleges that Northern Valley could not provide broadband speeds of 25/3 Mbps in the Overlap Area and intentionally misrepresented its broadband speeds in its 2017 Form 477 to injure Venture. Doc. 1 at 12. Venture seeks compensatory damages for the $12,683,700 it claims it was wrongfully denied in federal subsidies as well as punitive damages.[6] Doc. 48 at 20; Doc. 134 at 5.

---

[6] As previously stated, Venture initially requested compensatory damages in excess of $20,000,000 in its complaint and Amended Complaint. Doc. 1 at 14; Doc. 48 at 20. However, this Court assumes the Venture now would seek compensatory damages in the amount of $12,683,700 based on the report of its expert, Dominic Villecco. Doc. 127-1; Doc. 127-2; Doc. 134 at 5.

This Court issued an opinion and order granting Defendants' motion to dismiss the count for fraud as well as unfair competition to the extent it was subsumed under the count for tortious interference with a business expectancy.  Doc. 20 at 24–25.  This Court refused to dismiss Venture's claim based on the private right of action under 47 U.S.C. §§ 206, 207, and § 220(e), and for tortious interference with a business expectancy.  Doc. 20 at 25.  Defendants have now filed a motion for summary judgment on the remaining counts, along with four motions to strike Venture's experts.  Docs. 99, 101, 102, 103, 104.

## II. Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials" in his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." Gacek v. Owens & Minor Distribution, Inc., 666 F.3d 1142, 1145 (8th Cir. 2012).  To establish that a material fact is genuinely disputed, the party opposing summary judgment must "cit[e] to particular parts of materials in the record" that establish a genuine dispute or "show[] that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1)(A), (B).  In ruling on a motion for summary judgment, the facts and inferences fairly drawn from those facts are "viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (cleaned up and citation omitted).

## III. Discussion

### A. Private Right of Action under 47 U.S.C. §§ 206, 207, and § 220(e)

15

Venture claims there is a dispute of material fact as to whether Northern Valley intentionally misrepresented broadband speeds on its December 2017 Form 477 filing. Doc. 134 at 3. Specifically, Venture alleges that Northern Valley could not provide broadband speeds of at least 25/3 Mbps in 341 census blocks in the Overlap Area, pointing to Villecco's testing by radio frequency analysis of the 525 census blocks in the Overlap Area. Doc. 127 at 7–12; Doc. 127-1; Doc. 127-2; Doc. 134 at 4. According to Venture, Northern Valley lied on its Form 477 out of hostility arising from Defendants' 2015 litigation with SDN and Houdek. Doc. 1 at 12.

Defendants respond that there is no material dispute that Northern Valley's 2017 Form 477 filing was accurate and that they did not intentionally misrepresent advertised broadband speeds. Doc. 121 at 18–21. They argue that the FCC only requires broadband providers to report advertised speeds, not speeds actually provided, and further that Northern Valley could provide broadband internet at 25/3 Mbps in the Overlap Area as reported. Doc. 121 at 19–24. Defendants assert that it is common practice consistent with FCC guidance to report the same broadband speeds for many census blocks. Doc. 122 at 33. Defendants further claim they reported voice service subscription data accurately in their Form 477s, and Venture does not contest this. Doc. 121 at 18–19; Doc. 135 at 5.

Before reaching the merits of Venture's claim, there is a question of whether this Court has jurisdiction. Under 47 U.S.C. § 207, "[a]ny person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission . . . , or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; *but such person shall not have the right to pursue both such remedies.*" (emphasis added). By barring a party from pursuing remedies from both the FCC and federal courts, 47 U.S.C. § 207

prevents "duplicative adjudications and inconsistent results between federal court and the FCC." Premiere Network Servs., Inc. v. SBC Commc'ns, Inc., 440 F.3d 683, 688 (5th Cir. 2006) (cleaned up and citation omitted)

Courts have held both formal and "informal complaints" to the FCC that request some form of relief may qualify as a "complaint to the Commission" under 47 U.S.C. § 207. FCC regulations define an "informal complaint" as one in writing that contains "(a) [t]he name, address and telephone number of the complaint [sic], (b) the name of the carrier against which the complaint is made, (c) a complete statement of the facts tending to show that such carrier did or omitted to do anything in contravention of the Communications Act, and (d) the specific relief of satisfaction sought." 47 C.F.R. § 1.716; see also Digitel, Inc. v. MCI Worldcom, Inc., 239 F.3d 187, 190 (2d Cir. 2001) (per curium).

In Stiles v. GTE Southwest Inc., the Fifth Circuit reasoned that 47 U.S.C. § 207 "draws no distinction between formal and informal complaints." Stiles, 128 F.3d 904, 907 (5th Cir. 1997). Therefore, a customer who filed an informal complaint with the FCC regarding an alleged violation of the Federal Communications Act was barred from bringing a claim based on the same conduct in federal court. Id. Citing Stiles, the Second Circuit "agree[d] with the Fifth Circuit that, . . . the filing of an 'informal complaint' constitutes a 'complaint to the Commission' for § 207 purposes, and that, therefore, a party that has filed an informal complaint may not also sue in district court." Digitel Inc., 239 F.3d at 190 (citation omitted); see also Premiere Network Servs., 440 F.3d at 688; Mexiport, Inc. v. Frontier Commc'ns Servs., Inc., 253 F.3d 573, 575 (11th Cir. 2001); Cincinnati Bell Tel. Co. v. Allnet Commc'n Servs., Inc., 17 F.3d 921, 924–25 (6th Cir. 1994).

Here, Venture did not file a complaint with the FCC directly. However, Kuykendall on behalf of Venture arguably orchestrated an informal complaint to the FCC by filing Groft's letter

in May 2019. Doc. 124-10 at 2–5. That letter contained material details of Venture's request for more CAF funding including Defendants' contact information, facts suggesting a possible error on Defendants' part in violation of the Telecommunications Act of 1996, and the relief sought of reconsideration of Venture's CAF grant. Doc. 15-18. The FCC did not change Venture's A-CAM II offer after receiving this letter. Doc. 48 at 13–15; Doc. 124-11 at 22. This Court ultimately does not need to determine whether the letter prepared by Kuykendall for Groft to sign and then submitted at the end of May 2019 constituted an informal complaint filed with the FCC because Defendants' 2017 Form 477 filing was not a "willfully ma[de] false entry" as a matter of law.[7] 47 U.S.C. §§ 220(e).

To recap, 47 U.S.C. §§ 207, 208, and § 220(e) give a broadband provider a private right of action against a common carrier who "willfully ma[de] false entry" under the provisions of the Telecommunications Act of 1996, injuring that provider. 47 U.S.C. §§ 220(e), 207, 208; Venture, 492 F. Supp. 3d at 955–57. But there is no evidence that Northern Valley willfully overreported its broadband capabilities on its Form 477 filings to support an actionable claim. It is undisputed

---

[7] Proceeding in this manner does not violate the rule from Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998), that a federal court usually may not rule on the merits of a case before deciding that it has subject matter jurisdiction. First, at least one court has recognized the possibility that § 207's election of remedies provision could be "a waivable non-jurisdictional prerequisite to suit" rather than a "*jurisdictional*" bar." Digitel, Inc., 239 F.3d at 190 n.3. Second, the Steel Co. decision dealt with Article III jurisdiction whereas § 207, if it does indeed create a jurisdictional bar, raises a question of statutory jurisdiction. See Lukowski v. I.N.S., 279 F.3d 644, 647 n.1 (8th Cir. 2002) (assuming that the court had statutory jurisdiction to decide a claim and explaining that statutory jurisdiction was "not the type of jurisdictional issue that must be decided before addressing the merits of the controversy"); Edwards v. City of Jonesboro, 645 F.3d 1014, 1017–18 (8th Cir. 2011) (recognizing that it "is a matter of some dispute" whether Steel Co. requires courts to decide issues of statutory jurisdiction before reaching the merits of a claim); Butcher v. Wendt, 975 F.3d 236, 242 (2d Cir. 2020) (discussing Steel Co. and stating that the "bar on hypothetical jurisdiction . . . applies only to questions of Article III jurisdiction . . . . [W]e may assume hypothetical jurisdiction where the jurisdictional issue is statutory in nature" (cleaned up and citations omitted)).

that Defendants provided broadband services in the Overlap Area after acquiring NW. Doc. 110-6; Doc. 110-7 at 3–4, 6, 8; Doc. 122 at 27; Doc. 135 at 11. It is also undisputed that the FCC requires broadband providers to report maximum advertised speeds, and Defendants advertised speeds of at least 25/3 Mbps as Northern Valley reported in its 2017 Form 477. Doc. 111-1 at 5; Doc. 111-5 at 14; Doc. 120 at 3; Doc. 120-7 at 3; Doc. 122 at 2, 30; Doc. 134-8 at 6; Doc. 135 at 1, 12; Doc. 137-1 at 4.

Further, Venture's claim that Defendants were motivated to injure it is belied by the email exchange between Kuykendall and Groft, in which Groft agrees to assist Venture in its correspondence with the FCC. Doc. 124-10 at 1-7. The emails also reveal that Venture was aware that Northern Valley offered broadband in the Overlap Area before this lawsuit was filed. Doc. 124-10; Doc. 124-13. See also Hoffman v. Rashid, 388 F. App'x 121, 123 (3d Cir. 2010) (per curiam) (rejecting a Plaintiff's claim under 47 U.S.C. § 220(e) when there was no evidence that the Defendant's record-keeping practice was improper "or that such impropriety was specifically intended" by the Defendant or its employees).

According to testing by Venture's expert, Northern Valley provided 25/3 Mbps or faster speeds in just 184 of the 525 census blocks in the Overlap Area. Doc. 127 at 7; Doc. 127-1; Doc. 127-2. But this does not create a genuine issue of material fact because the FCC's guidance states "that it is not appropriate or feasible to collect actual speed information from broadband providers via Form 477. . . . [T]he collection of [broadband speed] data is a highly complex, time consuming, and expensive undertaking that requires the use of specialized equipment in the providers' networks and at their customers' premises." Doc. 122 at 2; Doc. 135 at 2. Moreover, "there is no way for providers to report actual speed information in a meaningful way." Doc. 122 at 2; Doc. 135 at 2. In 2008 and 2013, the FCC stated it had "not identif[ied] a methodology or practice that

could be applied, consistently and by all types of broadband filers, to measure the information transfer rates actually observed by end users." Doc. 122 at 2; Doc. 135 at 2. Although a broadband provider need not prove the actual speeds it offers by census block to comply with the Telecommunications Act, Northern Valley believed that it offered broadband speeds of 25/3 Mbps or higher in the Overlap Area based on information from NW during the acquisition, including information that NW reported providing broadband speeds of 70/8 Mbps and 25/3 Mbps in its 2017 Form 477. Doc. 110-6; Doc. 110-7 at 3–4, 6, 8; Doc. 111-5 at 10; Doc. 111-1 at 6; Doc. 122 at 24–26, 28; Doc. 135 at 9–12.

Northern Valley's Form 477 arguably was inaccurate in that it did not report 100 Mbps download speed, the maximum broadband speed it offered, in some census blocks. However, Venture does not allege that Northern Valley underreported its advertised speeds, and any such underreporting would not be actionable under 47 U.S.C. §§ 207, 208, and § 220(e) because it did not harm Venture. A-CAM II excluded census blocks from funding in which an unsubsidized competitor reported broadband speeds of at least 25/3 Mbps. Doc. 105-10 at 8; Doc. 122 at 13; Doc. 135 at 5. Therefore, the Overlap Area would not be eligible under A-CAM II whether Northern Valley reported broadband speeds of 25 Mbps download or 100 Mbps download in those census blocks. Because Venture cannot establish Northern Valley overrepresented its broadband speeds when completing its 2017 Form 477 in violation of FCC guidelines, or that it suffered any injury for any alleged underreporting of broadband speeds, summary judgment for Defendants is warranted on Venture's claim under 47 U.S.C. §§ 206, 207, and § 220(e).

### B. Tortious Interference with a Business Expectancy

"A federal court exercising supplemental jurisdiction over state-law claims applies state substantive law to those claims." Christensen v. Quinn, 45 F. Supp. 3d 1043, 1090 (D.S.D. 2014)

(citing Emmenegger v. Bull Moose Tube Co., 324 F.3d 616, 624 n.9 (8th Cir. 2003)). South Dakota substantive law governs the state law claims, and South Dakota recognizes a cause of action for tortious interference with business relations or expectancy. Tibke v. McDougall, 479 N.W.2d 898, 908–09 (S.D. 1992) (discussing the claim of tortious interference with business relationships or expectancies). Under South Dakota state law, the essential elements for tortious interference with business relations or expectancy are: "(1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional and unjustified act of interference on the part of the interferer; (4) proof that the interference caused the harm sustained; and (5) damage to the party whose relationship or expectancy was disrupted." Hohn v. Spurgeon, 513 F.3d 827, 829 (8th Cir. 2008) (applying South Dakota law); Mueller v. Cedar Shore Resort. Inc., 643 N.W.2d 56, 68 (S.D. 2002).

Venture cannot show "an intentional or unjustified act of interference" on the part of Defendants. Mueller, 643 N.W.2d at 68. For the reasons explained above, as a matter of law, Northern Valley's Form 477 complied with the FCC guidelines in so far as Northern Valley advertised broadband speeds of at least 25/3 Mbps and offered broadband in the Overlap Area as it reported. Doc. 111-1 at 5; Doc. 111-5 at 14; Doc. 120 at 3; Doc. 120-7 at 3; Doc. 122 at 2, 27; Doc. 134-8 at 6; Doc. 135 at 1, 11; Doc. 137-1 at 4. As such, Venture cannot show that Northern Valley wrongfully overreported broadband speeds and deprived it of funding under A-CAM II to support a viable claim. See Dykstra v. Page Holding Co., 766 N.W.2d 491, 499 (S.D. 2009) (explaining that the "intentional and unjustified act of interference on the part of the interferer must be improper" under South Dakota law). For the same reasons, Venture cannot establish "(1) the existence of a valid business relationship or expectancy [for funding in the Overlap Area]; . . . (4) proof that the [intentional and unjustified] interference caused the harm sustained; and (5) damage"

due to disruption of the expectancy.  Mueller, 643 N.W.2d at 68.  The Defendants therefore are entitled to summary judgment on the tortious interference claim.

### C. Civil Conspiracy

In the opinion and order granting in part and denying in part Defendants' motion to dismiss, this Court determined that Venture had alleged sufficient facts to support a claim that James Valley and Northern Valley engaged in a civil conspiracy to violate federal statutes and state tort law. Doc. 120 at 8–9.  Civil conspiracy "is not an independent cause of action, but is sustainable only after the underlying tort claim has been established."  Sancom. Inc. V. Qwest Commc'ns Corp., 643 F. Supp. 2d 1117, 1132 (D.S.D. 2009) (citation omitted).  To establish a civil conspiracy, the plaintiff "must show five elements: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action to be taken; (4) the commission of one or more unlawful overt acts; and (5) damages as the proximate result of the conspiracy."  In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig., 113 F.3d 1484, 1498 (8th Cir. 1997). Because Venture has not established any viable underlying claim to support a plausible civil conspiracy claim, summary judgment for Defendants is warranted on any civil conspiracy claim as well.  See Sancom, 643 F. Supp. 2d at 1132.

### IV. Conclusion and Order

Venture does not have any surviving viable claims as a matter of law, and summary judgment for Defendants is warranted.  Therefore, this Court need not address Defendants' motions to exclude or strike four of Venture's expert witnesses.

For the reasons discussed, it is hereby

ORDERED that Defendants' Motion for Summary Judgment, Doc. 104, is granted.  It is further

ORDERED that Defendants' motion to strike or exclude Plaintiff's expert witnesses, Docs. 99, 101, 102, 103, are denied as moot.

DATED this 11ᵗʰ day of May, 2022.

BY THE COURT:

_____

ROBERTO A. LANGE
CHIEF JUDGE